IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**GLORIA J. RUSH-MCDONALD**                                                                   **PLAINTIFF**

**V.**                                                                          **NO. 4:15-CV-97-DMB-DAS**

**DELTA REGIONAL MEDICAL CENTER**
d/b/a Delta Regional Health Clinic                                                          **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This employment discrimination action brought by Gloria Rush-McDonald is before the Court on the motion for summary judgment of Delta Regional Medical Center. Doc. #46. Because Rush-McDonald has not established a prima facie case of employment discrimination, the motion for summary judgment will be granted.

**I**
**Standard of Review**

"Summary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## II
## Factual Background

### A. Rush-McDonald's Education and Work History

Gloria J. Rush-McDonald is an African American female who graduated from the University of Mississippi in 1978 with a bachelor of science in pharmacy. Doc. #48-1 at 9–10; Doc. #48-11 at 20; Doc. #1 at ¶ 8. Following graduation, Rush-McDonald worked at "a little drugstore" in Meridian, Mississippi, until December 1978. Doc. #48-1 at 10–11. From December 1978 until 1988, she worked as a pharmacist for K&B Drugs. *Id*.; Doc. #48-2. Approximately two years after leaving K&B, she accepted a position as Midnight Pharmacy Supervisor at the University of Mississippi Medical Center in Jackson, Mississippi. Doc. #48-2. Rush-McDonald left that position in 2000 and began working at her family's residential construction business. *Id*. In 2002, she started a pharmacy consulting business, which she continues to operate. *Id*.

In 2003, Rush-McDonald received a call from a recruiter regarding an opportunity at King's Daughters Hospital in Greenville, Mississippi. Doc. #48-1 at 12. Rush-McDonald

traveled to Greenville for an interview and received an offer during her visit. *Id*. She accepted the offer and, in 2004, began working as Director of Pharmacy at King's Daughters. Doc. #48-2.

**B. Sale of King's Daughters and Creation of Assistant Director of Pharmacy**

Sometime in 2005, employees at King's Daughters were informed that the hospital had been sold to Delta Regional Medical Center ("DRMC"). Doc. #48-1 at 12. DRMC took over control of the hospital on April 1, 2005. *Id*.

At the time of the takeover, Lisa Fratesi, a white woman,[1] served as DRMC's pharmacy director. Doc. #48-3 at 4. Alphie Wells, then DRMC's director of human resources, asked Rush-McDonald to take a "slight increase in pay to stay and work as Lisa Fratesi's assistant."[2] Doc. #46-9 at 4; Doc. #48-1 at 12–13. Rush-McDonald accepted the offer and continued to work at King's Daughters, which became known as "Delta Regional's West Campus," as Assistant Director of Pharmacy. Doc. #48-1 at 12–13, 18; Doc. #48-4. The original DRMC hospital facility, also located in Greenville, became known as the Main Campus. *See* Doc. #46-4 at 58.

As Assistant Director of Pharmacy, Rush-McDonald was responsible for "[a]nything and everything for patient care … as far as medications go" at the West Campus.[3] Doc. #48-1 at 24. In addition to her pharmacist duties, Rush-McDonald served on the joint commission which "got

---

[1] Doc. #48-11 at 20.

[2] Although the Assistant Director position was offered to Rush-McDonald as a salaried position, approximately three weeks after the merger, Rush-McDonald was informed that "there could only be one salaried person in [the] department and that was Lisa." Doc. #48-4; Doc. #48-1 at 37. With Rush-McDonald's consent, DRMC reclassified the Assistant Director position as an hourly position. *Id*. at 37–38. In 2011, DRMC and Rush-McDonald agreed to reclassify the position as salaried. *Id*. at 38–39; Doc. #46-8 at Ex. 1.

Additionally, in 2010, with DRMC's approval, Rush-McDonald accepted a part-time pharmacist position with Allegiance Specialty Hospital, which was located on the West Campus. Doc. #48-1 at 13, 18. According to Rush-McDonald, Allegiance would pay part of her salary to DRMC. *Id*. at 14–15. The position with Allegiance became full time in July 2014, following Rush-McDonald's termination by DRMC. *Id*. at 79.

[3] Although Rush-McDonald was "physically located at the west campus, the computer system [at DRMC] was tied together. Whatever [Rush-McDonald] did as far as orders go was sent automatically through the software to the main campus." Doc. #48-1 at 37. It is unclear what percentage of her orders were sent to the Main Campus.

the hospital ready to maintain [its] accreditation," worked as administrator of DRMC's automated and dispensing computer system, known as Pyxis,[4] and supervised the pharmacy technicians across both campuses. *Id.* at 25, 33–36; Doc. 48-3 at 25–26. In her supervisory role, she would address issues between the pharmacists and technicians. Doc. #48-1 at 49–50. Normally, this role required her to address issues with the technicians; however, "maybe one percent of the time" she would discuss an issue with the pharmacist. *Id*. Rush-McDonald "also did a review of anesthesia and emergency room patient[ records] to capture revenue for the pharmacy and the hospital at the main campus." *Id*. at 25.

Although "primarily her roles and duties were at the west campus," "[s]he had authority as assistant director over both campuses." Doc. #48-3 at 25–26. All told, Rush-McDonald spent approximately 85% of her time at the West Campus and 15% at the Main Campus. *Id*. at 51–52. As Assistant Director, Rush-McDonald received the rating of "commendable" for her work performance at DRMC, the highest of four ratings, which reflects "results above those expected of the position." Doc. #48-6; Doc. #48-7; Doc. #48-8.

### C. Sean Laird Resignation and Hiring of Heather Lewis

In November 2013, Sean Laird, a full-time pharmacist at the Main Campus resigned his position to become a "PRN."[5] Doc. #46-1 at 55–56. Rush-McDonald informed Fratesi that she did not feel DRMC needed to fill Laird's vacant position. *Id*. at 57–58. However, on November 5, 2013, Fratesi completed an Employment Requisition form for a full-time pharmacist, listing Laird as the "Employee to be Replaced." Doc. #48-9.

---

[4] According to Rush-McDonald, when a doctor prescribes a medication, a pharmacist reviews the order and sends it to a Pyxis machine, where it is picked up by a nurse. Doc. #48-1 at 25. DRMC maintained twenty-eight Pyxis machines – seven at the West Campus and twenty-one at the Main Campus. *Id*. at 32–33.

[5] Although unclear from the record, DRMC represents, and Rush-McDonald does not dispute, that "PRN" refers to an employee who works on an "as-needed" basis. Doc. #47 at 4.

DRMC posted the pharmacist position on the website of the University of Mississippi's pharmacy school. Doc. #46-6 at 10. "Immediately" after posting the position, Fratesi was contacted by Heather Lewis. *Id.* Fratesi interviewed Lewis, who is white,[6] on March 4, 2014. *Id.*; Doc. #46-8 at ¶ 3. The same day, Fratesi completed an Applicant Interview form recommending that Lewis be hired. Doc. #46-8 at Ex. 2. The next day, the Human Resources Department conducted a reference check on Lewis. *Id.* at ¶ 3.

On April 25, 2014, Lewis traveled to Greenville to meet with DRMC's Human Resources Department. Doc. #46-7 at 7. During her visit, Fratesi took Lewis around the hospital and Lewis received a written offer. *Id.* at 7–8. That day, Lewis "told them that [she] would come to work for them." *Id.* at 8. Lewis received pre-employment information and, the next day, completed two pre-employment forms. *Id.* at 15; Doc. #48-18; Doc. #48-19.[7] After Lewis accepted the offer, DRMC's Human Resources Department removed the vacancy announcement from its website. Doc. #46-8 at ¶ 4. However, Lewis, who was still a student, was not eligible to begin work at DRMC until she graduated.[8] Doc. #46-7 at 11.

Lewis graduated from pharmacy school on May 14, 2014. Doc. #46-7 at 4. On May 21, 2014, DRMC sent Lewis a "letter … confirm[ing] our verbal offer and your acceptance of employment … as a Full Time Pharmacist." Doc. #48-21.

### D. Performance Improvement Plan

On May 15, 2014, Insight Health Partners, pursuant to a February 2014 contract with DRMC, presented to DRMC a Performance Improvement Plan offering recommendations for

---

[6] Doc. #46-1 at 93.

[7] One of the employment forms, an Acknowledgment of Receipt of an employee handbook, appears to come from a file named "PRE-EMPLOYMENT PROCESS," lists an Employee Number for Lewis, and states that she is a "staff pharmacist." Doc. #48-19.

[8] According to Rush-McDonald, it is not unusual for an employer to make an offer to a pharmacy student before the student passes her boards. Doc. #48-1 at 61.

5

operations at the campuses. Doc. #46-5 at ¶¶ 3–4; Doc. #48-14. Of relevance here, the Performance Improvement Plan included the following suggestion:

> West Campus - Staff a full-time pharmacist and Pharmacy tech at the West Campus during the weekday hours. If the West Campus does not close within the next couple of months, I suggested that these positions be eliminated. It would be acceptable to keep one pharmacist, if utilized as a clinical pharmacist for ICU, Telemetry, & ED.

Doc. #48-14.

At the time Insight made its suggestion, the West Campus employed one full-time pharmacist—Rush-McDonald; and one pharmacy technician—Rose Middleton, a white woman.[9] Doc. #46-5 at ¶ 5.

After reviewing the Performance Improvement Plan, Amy Walker, a white woman[10] then the chief clinical officer at DRMC,[11] decided to close the pharmacy at the West Campus. *Id*. at ¶ 6. Walker testified that it was a "business decision to close the west campus pharmacy" and that she decided to terminate Rush-McDonald because Rush-McDonald was the pharmacist at the pharmacy to be closed. Doc. #46-3 at 11–12. On or about May 27, 2014, Walker informed Fratesi that Rush-McDonald would be terminated and inquired whether there were any openings at the Main Campus, but was told there was not. *Id*. at 12–13; Doc. #46-5 at ¶¶ 5, 7.

### E. Rush-McDonald's Termination

On the morning of May 29, 2014, Fratesi asked Rush-McDonald to go to the office of Chrissy Nicholson, a white woman then the vice president of human resources. Doc. #48-1 at 14; Doc. #48-11 at 4, 6; Doc. #46-9 at 20. When Rush-McDonald entered the office, Walker, Nicholson and Fratesi were present. Doc. #48-1 at 69–70. Shortly after Rush-McDonald sat

---

[9] Middleton's race is not reflected in the record. However, Rush-McDonald contends, and DRMC does not dispute, that Middleton is white. Doc. #49 at 3.

[10] Doc. #48-11 at 20.

[11] Doc. #46-3 at 4.

down, Walker informed her that they were going to close the pharmacy at the West Campus and that Rush-McDonald's position was to be terminated immediately. *Id*. Walker told Rush-McDonald that DRMC would provide six weeks of severance, including continued insurance. *Id*. Although Adams initially told Rush-McDonald that DRMC would "pack your things and send them to you," Rush-McDonald insisted that she needed to return to the West Campus to perform an inventory to comply with relevant regulations. *Id*. Rush-McDonald and Fratesi then returned to the West Campus to perform an inventory. *Id*. at 71–72.

The same day, Nicholson executed a Personnel Action Form reflecting the termination of Rush-McDonald's position on May 29, 2014. Doc. #48-13. The form states, "Position elimination – west campus pharmacy-closed." *Id*. At the time Rush-McDonald was terminated, DRMC employed between eight to ten pharmacists. Doc. #48-3 at 39. Of these pharmacists, one was African American; and only employed part-time. *Id*. at 39.

### F. Offer to Rose Middleton

When the West Campus pharmacy closed, Middleton, the West Campus pharmacy technician, was on medical leave. Doc. #48-5 at 5, 8. While on leave, Middleton received a call from Fratesi stating that "they had made the decision to close the west campus" but that Middleton "would come across to the main campus."[12] *Id*. at 8. Ultimately, Middleton decided to retire rather than return to work. *Id*. at 5. According to Middleton, she retired because "I was 65 years old. 40-plus years was enough and I have two grown kids that [were] on me to hang it up …." *Id*.

### G. Heather Lewis Employment

Although Lewis originally accepted DRMC's offer for a pharmacist position, she began

---

[12] Fratesi explained that she made this offer because Middleton was "on medical leave and our policy [was] if you're on medical leave, you have a position." Doc. #48-3 at 26.

her employment with DRMC on June 11, 2014, as a pharmacy intern upon signing a document accepting such position. Doc. #46-7 at 10–11. According to Lewis, it was necessary that she work as an intern because she had graduated from pharmacy school but had not yet passed the pharmacy boards. *Id*. at 11; Doc. #46-4 at Ex. 11. On July 17, 2014, Lewis, right after getting licensed, signed a new document accepting an offer to work as a full time pharmacist at DRMC. Doc. #46-4 at Ex. 13; Doc. #46-7 at 11.

### H. EEOC Charge and This Action

On July 7, 2014, Rush-McDonald filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging race discrimination. Doc. #1-1. On February 24, 2015, the EEOC issued Rush-McDonald a Notice of Right to Sue. Doc. #1-2. Rush-McDonald filed this action on May 19, 2015, in the United States District Court for the Southern District of Mississippi, asserting a single claim – wrongful termination based on race in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. Doc. #1. On DRMC's motion, the action was transferred to this Northern District Court. Doc. #9.

On May 30, 2016, DRMC filed the instant motion for summary judgment. Doc. #46. Rush-McDonald responded in opposition on June 13, 2016. Doc. # 48. DRMC replied on June 17, 2016. Doc. #51.

### III
### Analysis

"Title VII prohibits discrimination 'because of' a protected characteristic, including race." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(a)(1)). "A plaintiff may prove Title VII discrimination through direct evidence or circumstantial evidence." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). When, as here, a plaintiff lacks direct evidence of discrimination, she "may yet prevail …

8

by providing circumstantial evidence sufficient to raise an inference of discrimination. In such cases, courts normally apply the *McDonnell Douglas* burden-shifting framework." *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (internal citations omitted). Under this framework:

> the plaintiff must first demonstrate a *prima facie* case, and then the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. If it does that, "the presumption of discrimination disappears." The plaintiff, who always has the ultimate burden, must then "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination."

*Outley*, 840 F.3d at 216 (internal citations omitted) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011)).

## A. Prima Facie Case

Generally, "[t]o establish a prima facie case, a plaintiff must demonstrate that he, (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."[13] *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014) (internal

---

[13] In its motion, DRMC cites the more relaxed prima facie standard used in reduction-in-force cases. Doc. #47 at 8. Rush-McDonald rejects this standard and argues that "[t]here was no reduction in force." Doc. #49 at 15.

As an initial matter, "[b]y definition, a reduction-in-force ['RIF'] occurs 'when business considerations cause an employer to eliminate *one or more positions* within a company.'" *Guerrero v. Granite Const. Co.*, No. 1:09-cv-737, 2011 WL 70601, at *3 (S.D. Miss. Jan. 7, 2011) (quoting *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 895 (6th Cir. 1997)) (emphasis added). The undisputed evidence shows that the closure of the West Campus pharmacy resulted in the elimination of two positions – the Assistant Director of Pharmacy (formerly held by Rush-McDonald) and the West Campus pharmacy technician (formerly held by Middleton). While it appears DRMC intended to create a new pharmacy technician position on the Main Campus, this fact does not mean that the West Campus pharmacy positions were not eliminated. Accordingly, it appears that this case does, in fact, involve a reduction in force. Nevertheless, because Rush-McDonald cannot satisfy a reduction in force prima facie case, the Court need not consider whether the standard is appropriate here.

To state a prima facie claim under the reduction-in-force standard, a plaintiff must show that she was a member of a protected class, that she was qualified for the position that she held, she was discharged, and that employees "who were not members of the protected class remained in similar positions." *Meinecke v. H & R Block of Hous.*, 66 F.3d 77, 83 (5th Cir. 1995). Alternatively, a plaintiff may introduce evidence that she was a member of a protected group, she was adversely affected by the challenged employment decision, she was qualified to assume another position, and "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the

quotation marks omitted). In seeking summary judgment, DRMC challenges only Rush-McDonald's ability to satisfy the fourth requirement. Doc. #47 at 9. Rush-McDonald responds that she can satisfy the fourth requirement because she was replaced by Lewis and because she was treated less favorably than the other pharmacists. Doc. #49 at 15–17. Rush-McDonald also argues that even if she cannot satisfy a traditional prima facie case, she has introduced sufficient evidence to shift the burden to DRMC. *Id*. at 17.

### 1. Replacement by Heather Lewis

Rush-McDonald argues that even though "Lewis was recruited to replace Laird when he resigned his full time position," Lewis in fact replaced Rush-McDonald because "Lewis did not sign her 'at-will' contingency letter until June 2, 2014." Doc. #49 at 16. The Court disagrees.

The undisputed evidence shows that Lewis was hired to replace Laird, not Rush-McDonald, with the initial offer to Lewis made and accepted approximately one month before

---

employer intended to discriminate in reaching the decision at issue." *Pryor v. MD Anderson Cancer Ctr.*, 495 F. App'x 544, 546 (5th Cir. 2012) (*quoting Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003)).

First, Rush-McDonald has not shown that any non-African American employees remained in a position similar to that of Assistant Director of Pharmacy – a role with supervisory authority and which was based on the West Campus. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 654 (5th Cir. 1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ("While CSC Logic did retain a number of younger employees after terminating Davis and Brown, these individuals were not in management positions similar to the plaintiffs."). Accordingly, Rush-McDonald cannot make a prima facie showing under the first reduction-in-force test. *See Ortiz v. Shaw Grp., Inc.*, 250 F. App'x 603, 606 (5th Cir. 2007) (in reduction-in-force case, employee did not remain in similar position where "Creighton held the position of a business development director, Ortiz worked as a area sales manager, meaning that Creighton was employed in the most senior manager position and Ortiz in the lowest ranking manager position").

As for the second test, "[e]mployers are not required to 'bump' [other] employees from their positions … in order to make room" for a plaintiff. *King v. True Temper Sports, Inc.*, No. 1:09-cv-168, 2011 WL 2224251, at *3 (N.D. Miss. June 7, 2011) (citing *Walter v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992)). Thus, a plaintiff must also show that the other position he was qualified for was available at the time of discharge. *See Roberson v. Game Stop, Inc.*, 395 F.Supp.2d 463, 476 n.3 (N.D. Tex. 2005) ("The second alternative establishes a *prima facie* case of discrimination if Plaintiff establishes that she was demoted when she was otherwise qualified to assume another similar *and available*, position, but was not considered for the position because of discrimination.") (second emphasis added); *Van Cleave v. Ameron Int'l Inc.*, 54 F. App'x 793, at *2 (5th Cir. 2002) ("[A] plaintiff must demonstrate … qualifications to assume an available position …."). Here, Rush-McDonald has offered no evidence that she was qualified for an available position on the Main Campus. While she was certainly qualified to work as a pharmacist, the undisputed evidence shows that, following Lewis' acceptance of the offer to replace Laird, the Main Campus had no full-time pharmacist vacancies.

Rush-McDonald's termination. Furthermore, Lewis was hired as a "Full Time Pharmacist" at the Main Campus, not as Assistant Director of Pharmacy at the West Campus. Finally, there is no evidence that any of Rush-McDonald's administrative responsibilities were transferred to Lewis. Put differently, Lewis was explicitly hired to replace Laird, not Rush-McDonald; was hired to assume a different position than was held by Rush-McDonald; and was hired to work in a different facility than Rush-McDonald. The timing of Lewis' signature on a form changes none of these facts. Under these circumstances, the Court concludes that Rush-McDonald was not replaced by Lewis. *See generally Perez v. St. John Med. Ctr.*, 409 F. App'x 213, 217 n.5 (10th Cir. 2010) ("Contrary to Mr. Perez's contention, a fact-issue is not created by his mere allegation that Pendleton was hired as his replacement. The record confirms that Pendleton was hired to replace a different 713 carpenter, Larry Faucet, who had resigned."); *Green v. Vt. Cty. Store*, 191 F.Supp.2d 476, 483 (D. Vt. 2002) ("Her claim fails, ... under the fourth element because there is no evidence Moriarty replaced Green; Moriarty assumed a different job title with mostly different job responsibilities and lesser management authority.").

### 2. Less Favorable Treatment

Next, Rush-McDonald argues that she "was treated less favorably than the white pharmacists working at the Main Campus, who were not terminated." Doc. #49 at 17. Specifically, Rush-McDonald submits:

> At the time of McDonald's termination, there were around eight white full-time pharmacists. All of them kept their jobs, while McDonald was eliminated. These are only two different facilities, they are not two different pharmacies. Both pharmacies are connected by a computer system and part of DRMC. Lisa Fratesi was the director for both campuses. McDonald was not the "West Campus" pharmacist, she was a pharmacist for the entire hospital and worked at both campuses. McDonald could have easily moved her office to the West Campus [sic] and worked there.

*Id.* at 16. DRMC argues that Rush-McDonald's argument must fail because she cannot show

11

that the full-time pharmacists were similarly situated to her. Doc. #51 at 3–4.

Where a plaintiff seeks to show that she was treated less favorably than similarly situated employees, she must show less favorable treatment "under nearly identical circumstances." *Morris v. Town of Indep.*, 827 F.3d 396, 401 (5th Cir. 2016). Under this rule, "employees with different supervisors, who work for different divisions of a company or ... who have different work responsibilities ... are not similarly situated." *Heggemeier v. Caldwell Cty.*, 826 F.3d 861, 868 (5th Cir. 2016). Furthermore, "if a difference between the plaintiff and the proposed comparator *accounts* for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id*. (internal quotation marks omitted).

In this case, beyond vaguely referring to "around eight white full-time pharmacists," Rush-McDonald has made no attempt to specifically identify these pharmacists or argue how these unnamed individuals, who held different titles and worked in what Rush-McDonald concedes was a different "facility," were "nearly identical" to her. *See Williams v. Louisiana*, No. 15-2353, 2017 WL 359218, at *7 (W.D. La. Jan. 24, 2017) (plaintiff failed to meet fourth prong where comparator evidence omitted "key facts and circumstances [such as] dates of hire, length of employment/seniority, and credentials/qualifications"). More importantly, the difference in workstations *accounts* for the fact that Rush-McDonald's Assistant Director position (which was based on the closing West Campus pharmacy) was terminated while the positions in the Main Campus were not. *See generally Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 237 (5th Cir. 2015) ("[S]ince Hoffman is the only person of the three who was part of the Magnetic Resonance Department, he alone was subject to the 'Department Specific Policy' with which he did not comply."). Accordingly, Rush-McDonald cannot use the Main

Campus pharmacists as comparators. *See Pollak v. Lew*, 542 F. App'x 304, 307–08 (5th Cir. 2013) ("Merely identifying other employees who he believed enjoyed more opportunities is insufficient.") (internal alterations and quotation marks omitted).

### 3. *McDonnell Douglas* Alternative

The *McDonnell Douglas* framework "did not purport to create an inflexible formulation." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). Accordingly, "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). After citing this general rule, Rush-McDonald, without argument or citation, states simply that "Plaintiff has satisfied her light burden of making a minimal showing of a *prima facie* case of race discrimination." Doc. #49 at 17.

> The Fifth Circuit has held:
>
> A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. It is not enough to merely mention or allude to a legal theory. We have often stated that a party must 'press' its claims. At the very least, this means clearly identifying a theory as a proposed basis for deciding the case—merely intimating an argument is not the same as 'pressing' it. In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and any Fifth Circuit Cases.

*Willis*, 749 F.3d at 319. District courts have applied this rule to find arguments waived at the trial level. *See Brooks v. Firestone Polymers, LLC*, 70 F.Supp.3d 816, 862 (E.D. Tex. 2014) (collecting cases). By failing to include any argument or citation supporting her argument that she has satisfied her prima facie case under an alternative *McDonnell Douglas* standard, Rush-McDonald has waived such an argument. *Id*.

### 4. Summary

The Court concludes for the reasons above that Rush-McDonald has failed to show a

13

prima facie case of race discrimination. Accordingly, DRMC's motion for summary judgment must be granted.

## B. Remaining Steps

Having found that Rush-McDonald has failed to satisfy her burden of establishing a prima facie case, this Court declines to address the remaining *McDonnell Douglas* steps. *See Ford v. Madison HMA, Inc.*, 867 F.Supp.2d 843, 848 n.7 (S.D. Miss. 2012) ("The court need not proceed beyond consideration of prima facie case where plaintiff has failed to adduce sufficient evidence to convince the court that her race was a motivating factor in her employer's decision to terminate her.") (collecting cases).

# IV
# Conclusion

Because Rush-McDonald has failed to make a prima facie showing that her termination was motivated by race, DRMC's motion for summary judgment [46] is **GRANTED**.

**SO ORDERED**, this 27th day of February, 2017.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**